THWING (GREAT WESTERN INS. CO. v.). See Case No. 5,738.

## Case No. 14,020.

### TIBBATTS v. TIBBATTS.

[6 McLean, 80.][1]

Circuit Court, D. Ohio. April Term, 1854.

EQUITY—RESCISSION OF CONTRACT—ABANDONMENT —HUSBAND AND WIFE.

1. Tibbatts and wife entered into a contract with defendant, by which he was put in possession of a large farm, containing stock of va-

[1] [Reported by Hon. John McLean, Circuit Justice.]

rious kinds to be managed by him, one third of the profits to be his, the other two thirds to be paid to the other party. Soon after entering into the possession, he, Tibbatts, sold the stock on the farm, and the implements of agriculture, and leased the farm, reserving to himself the homestead and a small part of the ground. The defendant became insolvent and unable to pay the money he had received on the sale of the property. The court *held*, that this was an entire abandonment of the contract, and that the wife of Tibbatts, who owned the land, might claim the possession of it. By the contract, Leo Tibbatts, was to have the sole management of the farm, &c., which was a special trust and confidence, he could not transfer to another. Any modification of the written contract Tibbatts may have made to the injury of his wife, and to which she gave no consent, did not bind her after his death.

[Cited in Irwin v. Bidwell, 72 Pa. St. 251; Schofield v. Jones (Ga.) 11 S. E. 1034.]

2. The contract was decreed to be cancelled and the possession of the premises to be restored to the complainant.

In equity.

Swayne & Gwynne, for complainants.
Mr. Andrews, for defendant.

OPINION OF THE COURT. This is a bill in chancery praying, for the reasons stated, that a certain lease or contract in relation to the occupancy and management of a certain farm, by the defendant, should be set aside, and the possession of the same decreed to the complainant. The contract was entered into between John W. Tibbatts. and Ann Tibbatts, his wife, on the 2d day of August, 1851, with Leo Tibbatts, the defendant. They leased unto Leo Tibbatts until the first day of March, 1862, a certain tract of land or stock farm, situated and lying in the county of Union, and state of Ohio. containing between eleven and twelve hundred acres; and in consideration of the covenants hereinafter made and expressed on the part of the said Leo, covenant and bind themselves, their heirs, executors, administrators and assigns, that the said Leo shall hold, use and occupy, the said farm and tract of land, for and during the term aforesaid without let or hindrance, under the following covenant and condition, viz:—"the said Leo is to pay no rents during the term of this lease. Second, he is to manage and conduct the business and operations of said farm, in accordance with his own judgment, without being subject to the dictation or direction of any one else. Third, the stock, implements of husbandry, and other utensils appertaining to farming purposes, now on said farm, are to be fairly valued by disinterested persons, chosen mutually by the parties interested in this agreement, and at the end or termination of this lease, are to be accounted back in equal value. Fourth, Leo is to have one third, and John W. Tibbatts and Ann Tibbatts, two thirds of the net profits that may be made or accrue by the same. Fifth, the current expenses of the farm and the cattle too, are to be paid out of the general stock

funds of the concern. But the real estate tax of the farm is to be paid by John W. Tibbatts. Sixth, on any advances made by either of the parties to this lease, the concern is to allow an interest at the rate of six per cent. per annum. Seventh, the said Leo is to keep correct and regular book accounts of all the transactions of the farm; accounts of the receipts and expenditures of the same, which are at any time, whenever desired to be subject to the inspection of John W. Tibbatts, and Ann, his wife. Eighth, in case of the death of Leo Tibbatts, during the term of this lease, John W. Tibbatts and Ann, his wife, are to have peaceable possession of the premises."

The character of the above paper is a controverted point, by the counsel in the case. On the part of the plaintiff's counsel, it is argued, that the agreement is an article of copartnership, while on the other side, it is insisted that it is a lease. It is a matter of some nicety to draw the line between the agency and a copartnership. A stipulated sum to be paid out of the profits of the partnership, would not constitute, technically, an individual a partner, although his agreement would bring him substantially within some of the leading principles which constitute a partnership. It is not necessary to constitute a partnership, that each individual should contribute to the capital equally, or indeed that a partner should advance any portion of the capital. He may agree to contribute his labor in the management of the concern, which is sufficient to make him a partner, if he be a sharer in the profits and loss. "Partnership," says Fourier, "is formed by a contract, by which one person or partnership agrees to furnish another person or partnership, to whom it is furnished, in his or their own name or firm, on condition of receiving a share in the profits, in proportion determined by the contract, and of being liable to losses and expenses, to the amount furnished, and no more." This definition covers the contract before us. Tibbatts and wife furnished the farm, the stock and farming utensils, and Leo Tibbatts is to manage the farm and pay to Tibbatts and wife two thirds of the profits. And books are to be kept of the farming transactions, which are to be open to the inspection of the other party. The stock is to be valued, and on the termination of the contract, it is to be accounted for in value, and peaceable possession of the land is to be given up. Here the distribution is to be made of the profits, which subject all the parties to loss, as there can be no distribution, if there be no profits. If advances be made by either party, he is to receive from the concern, six per cent. on such advances. The current expense of the farm was to be paid by Leo, and the tax on the cattle. The tax on the land, Tibbatts and his wife were to pay. Leo was to manage the farm according to his own judgment, and not under the dictation of Tibbatts and wife. This would be a singular provision in a lease for eleven years; but if a partnership was intended, it would be a very proper and necessary stipulation in behalf of Leo, whose labor and skill were secured, for the management of the farm.

An agreement to lease improved ground, for a certain part of the product is common, and in such a case the lessor receives only his proportion of the profits. But under such a contract the lessee would be bound to use reasonable diligence in planting or sowing his crop; but there would be no such liability under the above contract; as Leo Tibbatts was to exercise his own judgment, and not act under the dictation of Tibbatts and wife. Here was a trust and confidence reposed in Leo, which he could not transfer to any other person. And this is not affected by the fact that Leo might be less competent than any one he might substitute in his place. But this contract did not relate to the management of the farm only, but included a large amount of live stock of various descriptions. These constituted a part of the capital furnished, and from which a profit was expected, as well as from the culture of the land. Indeed, it may be supposed, that the products of the fields, whether of pasturage or grains, would be used in feeding the stock and preparing it for market. This whole operation is different from an ordinary lease of ground, whether the rent be paid by a part of the product or in money. It is stipulated in the contract, that no rent should be paid. John W. Tibbatts was a lawyer, and could not but have known the significance of this provision. At the close of the contract, the farming utensils and the stock, in the language used, "are to be accounted back in equal value." A suggestion is made that a feme covert cannot form a copartnership. There can be no doubt, that with her husband she may enter into a partnership, as stipulated in the above contract—she having an interest in the capital.

Looking at the nature of the above contract and the language used by the parties, there is less difficulty in considering it a partnership agreement, than a mere lease for the term specified; paying rent. It provides, that in the event of the death of Leo Tibbatts, the contract should terminate. This is an unusual provision in a lease, but the principle applies to all cases of partnership, whether stipulated in the agreement or not. But let us consider the contract in this case as a lease, and see what must be the legal result from the facts. The intention of the parties is shown to be, from the language of this instrument, to derive a profit from the farm, not by the ordinary culture of grains, but as a stock farm. The contract was signed the 2d day of August, 1851, and about the 1st of May, 1852, Leo Tibbatts made, to

Eliphas Burnham, assessor, under oath, a return of the following stock, and its estimated value. Ten horses, seventy cattle, seven mules and asses, three hundred sheep, seventy five hogs, making an aggregate value of nineteen hundred dollars. It is evident from the amount of stock on the farm, the parties looked to that as the principal source of profit, although the contract contains no special provision on the subject; this view is strengthened from the fact that in the agreement the farm is called a stock farm, and that there is no stipulation in it, that Tibbatts and wife should be paid their proportion of the profits of the farm in agricultural products, or in the increase of the stock; the inference therefore is, that the distribution of the profits should be in money. It appears, too, from the depositions of persons residing in the neighborhood of the farm, that stock raising is the business of those who own large farms. This enables the farmers to realize a larger profit from their farms, with less labor, than any other kind of culture. And this farm is spoken of, as well adapted for a stock farm. James Taylor, son of the ancestor of complainant and the brother of Mrs. Tibbatts, says, that this farm was managed on the shares for his father for some years before his death, and that it yielded to him, as he thinks, about a thousand dollars per annum. Leo Tibbatts, it appears, took possession of the farm in August, 1851, and during the ensuing spring he commenced selling the stock on the farm. In July, 1852, John W. Tibbatts died, and Leo continued the sales of the stock until all was disposed of. To Daniel Watson he sold stock to the amount of seventeen hundred dollars, and the residue he sold to other persons. In the year 1853 the assessor's return shows that Leo had but one horse, valued at twenty five dollars. In 1853, Leo Tibbatts rented the farm, reserving the dwelling house and grounds around it, &c., to Daniel Watson, for seven hundred dollars, and for the year 1854 for one thousand dollars, the payment of which is acknowledged. This lease expires on the 1st of March, 1855. No rent has been paid or offered to be paid to John W. Tibbatts in his life time, nor to his widow, since his decease. And it is alleged in the bill, that Leo Tibbatts is insolvent, and utterly unable to carry on the farm under the contract.

On the above facts the complainant's counsel contend, that Leo Tibbatts has abandoned the contract, and that the consideration on which it was entered into, has failed. Several excuses are set up in the answer, for the sale of the stock, &c., and proof has been introduced to sustain the answer. It is alleged, that the stock was poor, and not such as would be most profitable on the farm, and that it was sold with the consent of John W. Tibbatts. And in regard to the money received from the stock, it is stated, that it was applied in part payment of a debt due

by the estate of John W. Tibbatts to Leo, the defendant, for personal services, and otherwise, amounting to the sum of $6,383.56; in which account certain credits are entered, amounting to the sum of $4,420.31, leaving a balance due to Leo of $1,963.25. In this account credit is given for the stock on the farm, sold to Watson and other persons. It is averred, that the object in selling the stock, was to replace it by stock of a better quality, which would be more profitable to the parties concerned. Another reason assigned is, that in April, 1853, the complainant commenced an action of ejectment to recover possession of the farm; and that the prosecution of that suit, rendered it necessary for him to lease the farm to Watson, as the best disposition that could be made of it, for the parties interested. And defendant avers it to be his intention to carry out the contract, and proposes to give security for the payment of any rent that has accrued, or that may become due, which the court may order.

In his will, the father of the complainant, gave the farm in question to his daughter, Ann W. Tibbatts, "to have and to hold the same during her natural life, and to enjoy the rents and profits thereof for her separate, sole and exclusive use and benefit, and for the use and benefit of no other person." In this devise it is clear that the testator intended to vest this land in his daughter exclusively, and not subject to the will or control of her husband. But it may be admitted that uniting with her husband as she did, in the written contract respecting this stock farm, it may be treated as a valid instrument; whether it be denominated an article of copartnership or a lease. But a court, in considering the agreement as the one or the other of these instruments, cannot disregard the parties to it, and the circumstances under which it was made. Whilst the wife of Tibbatts should be considered bound to the full extent of the instrument, her interests should be protected, from any arrangement beyond the written agreement, which her husband may have made with his brother, to her injury. Her obligations so far as they exist, arise out of the written contract. The contract was made in relation to the farm and the stock as they existed at the time. And it was in reference to this state of things, that the complainant was induced to sign the agreement. In it nothing was said as to selling the stock, to purchase other and better stock. Nothing is said in the contract in regard to such a sale or purchase, or how the funds were to be procured. From the circumstances of the parties and their relation to each other, there is nothing from which such a presumption can arise. The contract embraced the stock, the farming utensils and the land. Besides, if the object in selling the stock, as alleged by the defendant, was, to supply its place by purchasing better stock, why were not the pro-

ceeds of the sale so applied? But not only the stock was sold, but the farming implements also, which seem to have been limited, as the sum for which they sold was set down at thirty dollars. The farm also was leased by the defendant for two years as above stated. These acts by him evinced a determination, as it would seem, rather to profit by the possession he had, than in good faith to carry out the contract. He was bound not to assign the indenture without the consent of Tibbatts and wife in writing. It is probable that the land was leased in consequence of the step taken by the complainant to get possession of the premises. In the lease for 1854 it is stated, that the rent was paid. This is rather an extraordinary circumstance, as it is not supposed to be usual to pay a money rent in advance.

In regard to the amount presented against the estate of John W. Tibbatts, which not only covers the proceeds of the sale of the stock, but leaves a large balance due to the defendant, it is singular that it was never presented to the administrator of Tibbatts, though public notice was given to all who had claims on the estate to present them for adjustment. Tibbatts had been dead some two or three years before this account seems to have been made out, and the administrator had no knowledge of it. It is proved, that Leo Tibbatts was some years in the service of his brother as clerk, at a thousand dollars a year, but it is hardly probable that he could have had no occasion to call for his salary during that time, for the support of himself and family. Some of the witnesses, well acquainted with the defendant at Newport, when these services were rendered, are under the impression, that the defendant was largely indebted to his brother. This account it seems was never known to the administrator of Tibbatts until the present emergency, which is a circumstance suggestive of doubts as to its validity. But however this may be, the question of law, arising on the facts is not affected by it. By selling the stock and leasing the ground, the defendant has not only disregarded the contract, but has disabled himself from carrying it into effect. The lessee of the defendant of course must receive compensation for his labor and care, so that the rent paid by him to the defendant, should be paid to the complainant. On what principle, under the facts, could the defendant claim a part of this rent? He was entitled to but one third of the profits and those or a greater proportion, are paid to Watson, who has been substituted by the defendant for himself. If the husband consented to the sale of the stock, it was to the prejudice of his wife; and after his decease, the contract having been materially altered, she was under no obligation to continue it. To make the farm a stock farm, as it was when the defendant entered into the possession of it, a large outlay would be required, which the complainant may not be able to afford, and

which is foreign to the contract and to the understanding of the parties.

Under the circumstances, I think the defendant has utterly disregarded the contract and abandoned it, and the proposal to give security cannot avail him, as he has forfeited the confidence of the complainant by an entire disregard of the obligations of the contract, and of her interests in particular. If the contract constituted a partnership, the death of John W. Tibbatts dissolved it; and if the contract be considered a lease, the sale of the personal property, and the leasing of the farm, and the inability of the defendant to restore the farm to its former condition, by which means only the profit contemplated by the complainant can be realized, releases her from obligation to continue the defendant in possession of the premises. The court will therefore decree that the contract shall· be delivered up and cancelled, and that the defendant relinquish the possession of the premises on the first day of March next, and on failure to do so, that a writ of possession shall be issued to the marshal, commanding him to turn the defendant out, and put the complainant into the possession. And in the mean time, the defendant is enjoined from committing any waste or injury to the farm, or any part of the improvement or timber on the same. And an account was ordered.