**MOORE v. SCOTT et al.  (No. 12086.)**

Court of Civil Appeals of Texas. Fort Worth. Feb. 16, 1929.

Rehearing Denied March 30, 1929.

McLean, Scott & Sayers, of Fort Worth, for appellant.

Leo Brewster, William F. Young, and Marvin B. Simpson, all of Fort Worth, for appellees.

CONNER, C. J. This suit was prosecuted in the district court of Tarrant county to its final conclusion by the Scott Grain Company, a corporation, against W. N. Moore and George Pitts. As a basis for recovery, the plaintiff alleged that it had sold to the defendants, Moore and Pitts, as partners in the operation of the Oakland Poultry Farm, certain merchandise, consisting of grain and feed for the stock and poultry on the farm, as shown by Exhibit A attached to the petition. In the alternative, plaintiffs alleged that the defendant Pitts was the agent of defendant Moore, with full or apparent authority to purchase the feedstuff sold, and that the defendant Moore was liable for a balance due upon the account of $1,559.10, for which, with interest thereon at the legal rate from January 1, 1926, judgment was sought.

The defendant Pitts was duly cited, but made default. Defendant Moore pleaded a general denial and a verified denial of the partnership.

The case was submitted to a jury upon special issues, in answer to which the jury found (1) that the defendants were partners at the times alleged in the petition; (2) that the plaintiffs or their agents were not instructed by the defendant Moore not to sell or deliver foodstuff to the defendant Pitts, without first obtaining the said defendant Moore's approval of same; (3) that the charges made by the plaintiffs were the reasonable and customary market prices; (4) that there was a balance due the plaintiffs of $1,067, for which sum judgment was rendered against defendants Moore and George Pitts as partners. Moore alone has appealed and assigns error.

Plaintiff below filed a motion for new trial assigning errors to the proceedings, and later filed more formal assignments. Appellee's objections to the propositions and assignments of error as presented are on the ground that they are not copies of assignments of error in the motion for new trial. This particular objection, however, seems to be no longer tenable in cases where, as here, formal assignments have been later filed. See Phillips Petroleum Co. v. Booles, 276 S. W. 667. In that case Mr. Justice Speer, of section B of the Commission of Appeals, reviews previous decisions construing article 1612 of the 1914 Statutes (now article 1844 of the 1925 revision), and concludes that:

"From a consideration of the statute and the decisions of the Supreme Court interpreting it we deduce the following: (a) In any case where a motion for new trial is filed it may, or may not, at the option of the appellant, constitute the assignment of errors relied upon for reversal. (b) In any case, whether tried by the court or before a jury, either upon a general charge or upon special issues, the appellant may present errors to the appellate court, either through a motion for new trial filed below or by other assignments duly filed in the trial court. (c) Where other assignments are filed, they may supplement or even displace the grounds set forth in the motion for new trial filed. They need not be copies of such grounds nor even substantially the same, but may be entirely distinct and different therefrom. (d) In no case, however, will an error (not fundamental), as to a matter not called to the attention and ruling of the trial court, either in

the course of trial or through the offices of a motion for new trial, be ground for reversal in the appellate count. (e) A commendable practice in this respect is to file in all cases a motion for new trial, presenting those points which have arisen to the time, and thereafter to file in the trial court supplemental assignments of error, presenting only those matters not covered by the motion, thus availing the appellant and the courts of the benefits of the amended article 1612."

█ Inasmuch as the assignments submitted to us are at least substantial copies of the formal assignments imperfectly stated in the motion for new trial, the objections referred to will be overruled.

Special issue No. 1 and its accompanying supplementary instruction reads as follows:

"'Partnership,' as that term is used in this charge is defined to you by the court to be a combination by two or more persons of capital, or labor, or skill, for the purpose of business for their common benefit.

"Special Issue No. 1:

"Bearing in mind the foregoing definition of 'partnership,' as defined hereinabove, you will answer the following question:

"Question: Beginning with January 3, 1925, and down to and including the 22nd day of July, 1925, do you find from the evidence that there was a partnership existing between' the defendants, W. N. Moore and G. A. Pitts, in the conduct of the poultry farm in question?

"Answer: Yes."

To the definition of the term "partnership," appellant duly objected below, and assigns error here as follows:

"Because the same is not applicable to the facts adduced upon this trial, and is misleading, confusing, ambiguous, and not capable of understanding by said jury in that the phrase therein used, 'for the purpose of Business' is in the abstract and too broad, and permits the jury to speculate as to what meaning thereof was intended, and further the phrase 'for their common benefit' used in said definition is misleading and confusing, and not such definition and explanation as would properly define a partnership, and said instruction permits the jury to consider any and all benefits that might accrue either to Moore or to Pitts by reason of any association, and does not limit the same to such benefits as might arise from an agreement expressed, implied, or acquiesced in, and permits said jury to consider, in connection with the definition of the partnership, any benefit in the way of rents, increase in values, or improvement on said property as constituting partnership."

Appellant further assigns error to the action of the court in refusing its requested instruction peremptorily directing the jury to find in favor of defendants. The evidence in behalf of appellee necessary to consider in

disposing of these several objections was substantially as follows: The witness, George Pitts, one of the defendants in this case, who was offered as a witness by the plaintiff, testified that he met the appellant through a Mr. Wiley, one of the salesmen for the appellee; that through Mr. Wiley an appointment was made with the appellant, and the witness and Wiley went to the Metropolitan Hotel for a conference about the chicken business; that in this conference they discussed the question, and the appellant suggested to the defendant Pitts that he go out to see the chicken ranch, which suggestion the witness followed; that, after he had inspected the place, he went back to see the appellant, Moore, and told him that he liked the place for a chicken ranch; that, after talking to appellant about some of the stock on the place that he did not think would be profitable, it was decided that he should move out to the place. He further testified that it was agreed that for the first six months he was to have a living out of the place as his part; and that all over that much, together with whatever eggs and butter the appellant desired for his own use, was to go back into the place; that the appellant did not expect the place to make very much during the first six months, but after that the profits were to be divided equally.

The witness further testified that when he went out to the place there was certain live stock thereon belonging to the appellant, consisting of chickens, ducks, rabbits, and cows; that it was agreed that, if he thought any of the live stock would not be profitable, they would get rid of such portions of said live stock as would not return a profit; that they did sell many of the rabbits and ducks, and such chickens as were culled out. The witness, George Pitts, in addition to his services as a chicken expert, was to, and did, furnish about 150 chickens for their poultry business. All of the live stock was put together; feed was bought together for all of it; and they were fed together. The poultry business was to be conducted under the name of the Oakland Poultry Farm, and the bank account was carried in that name. The witness deposited money in the bank himself, and wrote the checks on the account. In making the improvements on the place, the defendant Pitts did part of the work, and part of it was paid for by reinvesting the profits in the place.

The appellee quotes from testimony of the defendant Pitts:

"You ask me what was the occasion of my meeting Mr. Moore at the Metropolitan Hotel at that time. I had been buying a little feed from Mr. Scott, or rather from Mr. Wiley, who I had known for some time before that time, and I had asked Mr. Wiley at any time he found a place which he thought I could rent or lease, to let me know, and

awhile after that he called me on my work, or called me at the house and told me that he wanted to see me the next morning, and the next morning I missed him in some way, and he came out the next morning and he told me that Mr. Moore told him he had a place that he wanted to put out on the shares, and I made an appointment—I didn't make an appointment with Mr. Moore, but I believe that I went that morning with Mr. Wiley, as near as I remember, to see Mr. Moore. We went to see Mr. Moore up in the Metropolitan Hotel, and Mr. Wiley went with me. Mr. Wiley introduced me that morning to Mr. Moore when we got to the hotel, the best I remember. And at that time Mr. Moore was in his room dressing. Mr. Wiley, the best I remember, was in there during the conversation. The conversation lasted just a few minutes.

"From the Metropolitan Hotel we went out to Mr. Moore's place. Mr. Wiley went with me. We went out there to look at the place, to see if I would like it. There was no one in the room when we were at the Metropolitan Hotel except Mr. Moore, Mr. Wiley and myself. Mr. Moore at that time was just getting up, when we went in. If I remember right, he was dressing. It was early in the morning.

"Mr. Moore at that time asked me if I had seen the place, and I told him that I had not, and he said that the best thing for me to do was to go out there and look it over, and see if it suited me. He said, 'See if you can make a living on it.' He said that he wanted me to see if I felt that I could make a living on it, and later on he asked me about what I thought about it. From the hotel Mr. Wiley and I went out to Mr. Moore's place, shortly.

"Mr. Moore, on his place where we went, had quite a few chickens, in the neighborhood of 400 or 450 or 500; I do not know just how many. His place was about a half a mile north of Sagamore Hill stop on the interurban. I would judge it was about that far. Mr. Moore told me that he owned the farm. As near as I remember, the farm consisted of about 17 acres. When I went there there was a six or seven room house, and two chicken houses, I believe, on it at the time, and a baby chick house, and a large house where they had the rabbits. They had a house there, I presume, about twenty by eight feet, maybe larger than that, and a well, and it was all fenced.

"With reference to the stock that I found there, I will say that there were several cows, and about 50 or 60 ducks, and between 100 and—if I remember right, about 137 rabbits, and I don't remember what else. There were about 400 or 500 chickens. They belonged to Mr. Moore.

"When Mr. Wiley and I went out there we looked over the place, and after that we then went back to see Mr. Moore. I disremember right now where it was that I met Mr. Moore when we came back to town, but I believe it was at the Metropolitan Hotel. We came back to town just a few hours after we had seen him the first time that morning, not more than an hour and a half, I don't suppose. When I got back to town I had a conversation with Mr. Moore. Mr. Wiley did not hear the conversation. The best I remember, the conversation that I had with Mr. Moore at that time was either at the Metropolitan Hotel or at the post office, and I don't know which.

"In that conversation Mr. Moore asked me what I thought of the place, and I told him that I thought it was a dandy. It was a good place for chickens, and I told him that it looked like it was in fairly good shape, but I told him there were some things out there that I didn't know whether I could make anything out of or not. There were some ducks and rabbits out there, and he said, 'If you think you cannot make anything out of them, we will get rid of the rabbits later, and the ducks, too,' and asked me if I thought I could make a living, and I told him I would do the best I could; if work would do any good, I would be glad to try it and do as I promised, and he wanted to know when I could take possession, and I told him right away, and that was about all that was said. This conversation took place along about the 15th of December, 1924, and in about two or three days after that, as near as I remember, I moved out there.

"As to the conversation that we had with regard to the profits or the income off of the farm, and as to how they were to be divided, I will say that about all of the conversation I had with him in regard to that was that we would draw up a contract later, after we would see about things, and all he wanted out of the place was a couple of dozen of eggs and a pound of butter every week, and what I got over that I could put back on the place.

"Q. What you got over that? A. Yes, his part of what I got over that, I could put back on the place. He told me, however, if I made a living out of it the first six months, why he would not say anything, but after that he expected his part of it, to go back in the place.

"Q. Just tell what the agreement was, what was said between you and Mr. Moore with reference to any profits that were made on the place the first six months, and after that? A. Well, I will go over the whole proposition again. The conversation, as near as I can remember it, was, when he told me that—I told him I would go out there and take the place over, and he said that what I could make out of it was mine; all he cared for out of it for awhile was just his pound or two of butter a week, and a couple of dozen eggs, and what I would make over that—

he did not suppose we would make more than a living out of it for the first six months, and he said after that we would split fifty-fifty on it.

"As to what was done, or what was to become of the live stock that I found on the place the morning that I went out there and inspected it, I will say that Mr. Moore told me that morning, as I stated before, that if I found out that I could not make anything out of the rabbits and the ducks, and things, he would sell them and get rid of them.

"With reference to the 400 chickens that were out there, that is what we were out there for, was to raise chickens, and to make that our business.

"The ducks that were out there stayed out there most of the time I was there, or most of them did, I think there were a few that went away from there. I think, if I remember right, about 18 or 20 ducks were sold from there, or maybe more than that, but not over twenty-four, I don't suppose; and the rabbits were all taken away from there in about five or six months after that. There was in the neighborhood of between four and five hundred rabbits taken away. There were about 150 when I went there. As near as I remember, when I went there there was 137 young and old rabbits.

"As to what became of the chickens that were there when I went there, I will say that part of them were sold as culls; about a month after that we culled them, and there was in the neighborhood of about 125 sold as culls, and there were a few that died. When I moved there, the chickens had the roup, that I didn't known anything about. They had bought a number of roosters from Jay Wills, and they were infected with the roup and in fact the entire bunch was infected with the roup pretty badly, and there was quite a number of them died.

"I could not tell you exactly how many of the original 450 or 500 chickens that were there when I went there died. I lost about 11,000 or 12,000 all told, baby chickens and all, before the end of the year.

"Q. You took 150 of your own? A. I do not remember; something like that, between 100 and 150; I do not remember just the number.

"Out there on the farm I looked after the chickens and the rabbits and ducks, cows: I took care of them.

"Mr. Moore's chickens and his ducks and his rabbits and his cows were not fed separately; neither was the feed bought separately. They were all put together, and all of the feed bought together and fed together. I did all of the buying.

"The name of the chicken ranch out there when I took it over was the Oakland Poultry Farm. I did not change the name of it. I conducted it in the name of the Oakland Poultry Farm.

"The name of the bank account was carried in the name of the Oakland Poultry Farm. I asked Mr. Moore how he wanted me to carry the money, or to deposit the money, and I asked him if he wanted me to deposit it in the name of the Oakland Poultry Farm, or to change the name of it and he said, 'No, just leave it in the name of the Oakland Poultry Farm.'

"There was a sign out there in front of the premises on which there was the name Oakland Poultry Farm, but that sign was not up when I went there. I did not put the sign up.

"I opened a bank account, after the conversation that I had with Mr. Moore with reference to that matter. I opened a bank account in the First National Bank in the name of the Oakland Poultry Farm. I deposited the money in the bank myself. There was no discussion between Mr. Moore and I with reference to what bank I should put the account in; however, there was a cashier of one of the banks came out to my place one Sunday before I made the deposit, and I told him that I was going to have to start a bank account, and he told me that he would be glad for me to trade with his bank, that that was the bank that Mr. Moore was doing business with. I believe the man told me that his name was either Mr. Harris, or Mr. Harrison; I forget. Mr. Moore was not present during that conversation.

"I had a pass book to the bank, and I also had a check book.

"Referring to the rabbits, which I said increased from about 150 to something like 400 or 500, those rabbits were not sold, but they were moved by Mr. Moore over to his other farm. Mr. Moore moved them to his other farm. As near as I can remember, that was in June, after I went there. I am not sure of the time. I went there in January.

"The book which you exhibit to me is the bank book that I had while I was out there. The first entry in the bank book is dated January 27, 1925. I did not have any conversation with Mr. Moore with reference to the bank account, only what I have told you. Prior to the time that I opened the bank account I handled the money, collected it and paid it out, and after I opened the bank account I handled it in the same way. I handled the regular check book, and I kept stubs of the checks. The check book may be in my papers. (Witness refers to his papers.) It was a large check book. It was a check book three checks wide.

"With reference to this bank account, I just used the money like I had full control of it. The checks were signed by myself. Oakland Poultry Farm, by me. I have some of the checks which I issued before me at this time. I kept a check stub of the checks. Ordinarily, I would put on the check stubs what the check was for. Mr. Moore asked me to give

him an account every thirty days of the bank account. He asked me to do that when I first went out there. I gave him a statement every 30 days, when I had time to.* But sometimes I didn't have the time. The statements that I would make to Mr. Moore with reference to the bank account were in writing. I don't know whether I have any of those statements here or not. We had some of them at the other trial of this case, if I remember correctly. After I would make those statements out, I left them at his office, at the post office. I took them down there in person. I would deliver those statements to Mr. Moore.

"I started there about the 15th of December, and I could not say how many statements I furnished to Mr. Moore. That is a pretty hard question for me to answer, because I do not remember, but I furnished him approximately three or four statements, as near as I remember. I know of three, and maybe four. I cannot tell you when I first delivered to Mr. Moore one of those statements. It would be guess work if I said when I first gave Mr. Moore one of those statements, but it would be along in March, I presume, but I would not be sure about it. That statement consisted of what I had sold and what I had paid out. I used my check book in making out that statement, and I also used my bank book. I would always bring that with me, the bank book. I also used the bills that I paid out; I kept copies of them.

"I do not remember any conversation right now that I had with Mr. Moore at any time when I delivered any of those statements to him, at the present time. I do not remember any conversation that I can recall right now.

"I went into possession out there in December, and I took charge of the chickens and the ducks, and the other things that I have described out there on the farm, and I moved my family there, and I took charge of the whole situation and I remained out there in charge and in control of the poultry farm known as the Oakland Poultry Farm in the neighborhood of about one year. When I first went out there Mr. Moore would come out there anywhere from two to six or seven times a week. He was out there quite often. I also would take him things from the farm. I would take him a couple of dozen eggs and butter. When Mr. Moore would come out there, as a general thing he never said very much. He would always come out with some friends, and show them around. If there was anything that he did not like, he would tell me to try to correct it.

"When I did anything out there, he always went over it. While I was out there on the farm, there were some improvements made on it. I built four chicken houses, four more. I did part of the work myself in doing that. Mr. Moore furnished the material. Mr.

Moore also paid for part of the labor, and I paid for part of it myself out of what we got on the chickens. I do not know what part Mr. Moore paid. Those improvements consisted of four chicken houses. Three of those chicken houses were twenty by forty feet, and one was thirty-six by twenty feet in size. They were constructed of two by fours, with a composition roof. I also put in a lot of fencing, cross fences in between the chicken houses. Those houses and those fences were built under Mr. Moore's orders. I do not think that there was anything done without his orders, except that I did put a double decker floor in a chicken house that he had there, in order to take care of some baby chickens that I could not sell. That was about the only thing I remember of that he did not know about, and was not done under his orders. I always consulted him with regard to building before I did it.

"When I first went out there Mr. Moore told me that if I saw where we could make some more money by buying some more chickens, that he would put up additional houses to take care of them, even if he had to cover the whole farm, and some time after that Mr. Hurdleston came out and wanted to sell us 1,000 chickens that he had, and I went out and looked at them, and I did not hear from him for two or three days and then Mr. Hurdleston came out to see me, and he seemed very anxious to get rid of them and I went back and talked to Mr. Moore again, and told Mr. Moore that we would have to have three more chicken houses, more than I had built. I had built one on my own accord, and Mr. Moore had paid for nothing but the lumber before that; and I told Mr. Moore that in order to take care of that many chickens we would have to have three more chicken houses, twenty by forty, and I don't believe that Mr. Moore gave me an answer on that day, but in a day or two after that he told me to make ready to take care of them and he said that he would see Mr. Hurdleston, and he would talk to Mr. Hurdleston and make a deal with him for the chickens.

"I spoke awhile ago about going out to Mr. Hurdleston's to see his chickens. Mr. Moore and I went, and we went in Mr. Moore's car. I drove up town in my truck and I met Mr. Moore at the post office, and we went out to Mr. Hurdleston's farm, which was on the Crowley road, out past the Baptist Seminary. One trip out there is all that I remember of that I made with Mr. Moore.

"I do not remember whether he sent anybody else out there to inspect those chickens or not. Mr. Wiley went out there with me to cull them, but I do not remember whether it was at his request or not. Mr. Wiley went with me and helped me to select them.

"Mr. Moore bought all of Mr. Hurdleston's chickens, and I brought them out to the Oak-

land Poultry Farm. I put them in a car. If I remember right, there were 906 hens. I cannot tell you whether it was in January or in February that the purchase was made. It was early in the year, however. I bought the feed to feed those chickens. I ordered it. I ordered it from Mr. Scott, the plaintiff here.

"I bought the feed that fed the rabbits that I found there on Mr. Moore's place when I went, from Mr. Scott. I bought the feed to feed the ducks also from Mr. Scott. I bought the feed from the same place, all from the same place.

"We got 906 hens from Mr. Maude Hurdleston, and I took them over there and fed them out of the same feed, which I have bought from the plaintiff.

"As to whether Mr. Moore knew where I was buying feed, I will say he told me in his first conversation that there was just one request he would ask of me, and that was that I buy the feed from Mr. Wiley, because he and Wiley were—Wiley was his friend. That is the way he said it. That was the first thing he said when we came in. Mr. Wiley was a salesman for Mr. Scott. He was at that time. Mr. Wiley was in the court room here a minute ago. I believe that I had met Mr. Wiley in 1922, if I remember right, prior to the time of this transaction. I do not know how long Mr. Moore had known Mr. Wiley at that time. When Mr. Moore told me that there was one request that he wanted to make of me, and that was that I buy the feed from Mr. Wiley, I told him that that suited me fine, because Mr. Wiley was a friend of mine, and what little feed I was buying, I had bought it from Mr. Wiley.

"Mr. Moore asked me how the account was running from time to time. One time that I remember of was when he came out to see me along in June of that year. He asked me, when the bill got up—I don't know what month it was, but it was when the bill was running about $1,000, and he said the bill was running pretty high, and he asked me if I thought I could get out of it, and I told him that I thought I could when the chickens matured so that I could sell the friers, and he said, 'If you don't, we will have to pay it.'

"As to how Mr. Moore knew how much the bill was, I will say that I had it on my list. I brought a list of it in, and showed to Mr. Moore at the post office. I delivered one to him along in March, if I remember right. That was the monthly statement that I spoke of awhile ago. I did not deliver to Mr. Moore any other statement, other than the monthly statement that I spoke of awhile ago, that is, not any statement from Mr. Scott. I might have had some other small bills. The monthly statement that I am speaking of was a statement that I delivered to Mr. Moore; covering the business out there. I did bring bills with that monthly statement that I had paid, and accounts and statements that I had gotten, and some that had not been paid.

"Q. Now, whose bills did you bring with those statements that were paid, and had not been paid? A. Well, I don't remember any now except those of Mr. Scott's that had not been paid. The only bills that I remember of bringing him of Mr. Scott's were the ones that had not been paid. When I would bring the bill from Mr. Scott to Mr. Moore's office, I would bring the last one that I would get. Those statements from Scott Brothers to me, which I exhibited to Mr. Moore, if I remember rightly, were just statements showing a lump sum. I do not think that they were itemized; they might have been, or they might not have been; I am not sure about that.

"You ask me to state what conversations took place between me and Mr. Moore when I would deliver those to Mr. Moore. Well, I don't remember. There were several things said, but I don't remember offhand what it was. I only know that Mr. Moore asked me to bring everything to him, and when I did, I generally left the bills with him, as I remember it. I am not sure about that. I might have taken them back with me. I am not sure.

"Referring to the chicken houses which were built out there, the labor for building those was paid by Mr. Moore, that is, for the first two weeks pay roll, and I think I paid the rest of it. When I say I paid it, I mean that the Oakland Poultry Farm did. I paid it out of the money I received there. The three checks which you exhibit to us, made payable to Mr. Turner, are for labor done on the chicken houses, and carpenter work, and these other checks which you exhibit to me are some checks I made payable to the men that I had working out there at that time on the place, a part of the time building fences, and a part of the time they were helping me take care of the chickens and the rabbits.

"Mr. Moore knew that I paid out these checks, because I told him about them. I told him about them later, and I had been doing that right along. I had been doing it each week. I told him when he came out there."

We have some difficulty in disposing of the objections above noted. We will first dispose of the objection to the charge. The author of Ruling Case Law, vol. 20, p. 800, declares that: "The difficulty of formulating a definition of a partnership, at once accurate, comprehensive, and exclusive, is said to be insuperable"—citing in a note to the case, Miller & Co. v. Simpson (107 Va. 476, 59 S. E. 378), 18 L. R. A. (N. S.) 967, where it is said that, according to the court, in Langley v. Sanborn, 135 Wis. 178, 114 N. W. 787, an accurately inclusive and exclusive definition of "partnership" seems to have eluded the capacity of courts to express.

In Fechteler v. Palm Bros. & Co., 66 C. C. A. 336, 133 F. 462, Lurton, J., thought it "not very prudent to define a partnership."

In Tibbatts v. Tibbatts, 6 McLean, 80, Fed.

Cas. No. 14020, the court thought it a matter of some nicety to draw the line between an agency and a copartnership.

In the course of an opinion holding the cultivation of a farm on shares no partnership, the court, in Donnell v. Harshe, 67 Mo. 170, remarked: "A definition of 'partnership,' broad enough to embrace all cases and narrow enough to exclude such as ought to be excluded, has been found a very difficult and embarrasing task to those writers who have published books on the subject." Other opinions of like import are also cited in the note referred to.

■ It is to be noted, however, that appellant's objection is not to the fact that the court gave a definition of the term "partnership," but, in substance, rather that it was not sufficiently explanatory and applicable to the evidence, and the record fails to show that appellant requested any instruction which would more clearly enlighten the court or jury and be of aid in determining the issue. While the charge seems broad enough to apply as well to the relation of landlord and crop-raising tenants and to "grubstake" agreements in mining undertakings, as to partnerships, and while it may seem to be the better practice in such cases for the court to submit for the jury's finding the necessary facts to constitute a partnership and not to undertake, as in the present case, to submit the issue in the form of a definition, yet in the case of Connellee v. Nees, 266 S. W. 502, the issue of partnership was presented, and, in an opinion by Mr. Justice Bishop, of section A of the Commission of Appeals, it is distinctly held that:

"The plaintiffs in error were entitled to have the court define to the jury the meaning of the term 'partnership' and submit this issue. They requested that such definition and submission be given, and this request was refused.

"Article 1984a, Vernon's Sayles' Statutes, provides that:

"'In submitting special issues the court shall submit such explanations and definitions of legal terms as shall be necessary to enable the jury to properly pass upon and render a verdict on such issues.'

"Article 1985 provides that—

"'It shall be the duty of the court, when it submits a case to the jury upon special issues, to submit all the issues made by the pleading.'

"The issue requested was one of fact 'made by the pleading.' The term 'partnership' has a definite legal meaning. The provisions of the statute should have been complied with. The term should have been defined and the issue submitted. We are not authorized to speculate as to whether the plaintiffs in error were injured by the failure of the trial court to comply with the provisions of these articles."

The Commission reversed and remanded the case, and the Supreme Court not only adopted the judgment of the Commission, but also added: "We approve the holding of the Commission of Appeals on the question discussed in its opinion."

■ As before stated, appellant made no objection to the fact that the court undertook to define the term "partnership" in submitting issue No. 1 to the jury, and, it having been decided that, where the pleadings and evidence raise the issue of partnership, it is proper for the court to define the term, we feel unable to formulate a better definition than that given by the court. It is a literal copy of a definition given in 20 R. C. L. p. 800, said to have been approved in the case of Ash v. Guie, 97 Pa. 493, 39 Am. Rep. 818. The same author on the same page refers to the definition of Chancellor Kent, and says: "This learned jurist defined a partnership as a contract of two or more competent persons to place their money, effects, labor, and skill, or some or all of them, in lawful commerce or business; and to divide the profit and bear the loss in certain proportions, which definition has been many times quoted with approval"—citing decisions from Alabama, Arkansas, Kentucky, Oregon, and Virginia.

We feel unable to say that the pleadings or evidence fails to raise the issue of partnership or that under the circumstances the court committed reversible error in overruling the objections to the definition given by the court.

■■ Nor do we feel able to say from the evidence in the case, considering all circumstances most favorable to appellee and rejecting all evidence of a contrary tendence, that the court committed error in refusing to give appellant's requested peremptory instruction. By reviewing the evidence, which we have hereinbefore set out at perhaps too great length because of the closeness of the questions presented, we think it must be said that the evidence at least raised the issue of a combination by appellant and Pitts of their capital, labor, or skill, for the purpose of business for their common benefit, and that the finding of the jury must be construed as a finding in favor of appellee, even though it be considered as a mixed question of law and fact, of all of the necessary elements that enter into and constitute the status of a partnership. While to constitute a partnership there must be an agreement, it need not be an express one; a partnership may be implied from the circumstances. See Dilley v. Abright, 19 Tex. Civ. App. 487, 48 S. W. 548; Freeman v. Huttig Sash & Door Co., 105 Tex. 560, 153 S. W. 122, Ann. Cas. 1916E, 446. In the case last cited, it appears that Freeman bought Campbell's interest in the business without any intention of becoming a partner. His intention, as well as the intention of Yost and Sewell, was to become a stockholder in a corporation to be immediately formed for the conduct of the business. The formation of the corporation was deferred and finally

abandoned. During the time that the formation of the corporation was suspended, the purchaser, Freeman, suffered the business to be conducted in the ordinary course, under the same name, by Yost, the active manager of the original partnership. After about two months, Freeman decided to proceed no further, and advised the liquidation of the business or its sale. From that time, for about three months, when a receiver took it in charge, the business was conducted with this end in view, but nevertheless, as an existing business, without his active participation in its management, but to some extent with his direction. In holding that Freeman was a partner, Chief Justice Phillips said:

"We now pass to the consideration of the question of whether Freeman became a partner with Yost and Sewell following his purchase of Campbell's interest in the firm, upon the decision of which depends that of his liability for the two other classes of debts sued on. A decision of the question requires first, the ascertainment of their actual relation, and then the determination of whether a partnership was thereby constituted, giving effect to their intention, if possible, but having regard for the rule that parties may intend no partnership and yet form one. Cothran v. Marmaduke, 60 Tex. 370; Beecher v. Bush, 45 Mich. 188, 7 N. W. 785, 40 Am. Rep. 465. There is no doubt but that Freeman had no partnership relation in view when he acquired Campbell's interest, or as to its being his purpose that his only association with the business should be that of a stockholder in a corporation to be formed for its conduct. In this initial stage of his connection it is clear that his status was simply that of a co-owner, having none of the elements of a partnership relation. The intended corporation, however, was not formed. While the purpose to form it still remained, it became necessary to defer it; and it was deferred as by common consent until the return of Freeman from his eastern trip. The business, though, went on exactly as it had theretofore, under the same name, still under Yost's active management, in the full guise of a going concern, and in the full exercise of its ordinary functions. It did not cease its operations to await the organization of the corporation, and it does not seem to have been considered that it should do so. It continued to make sales and to contract indebtedness for goods as in ordinary course throughout this entire interval; and, with the qualification that its scope was narrowed for the possible purpose of liquidation after Freeman's return in September, it may be said to have been operated as a going concern down to the time of the appointment of the receiver.

"The question that arises is, Did Freeman remain simply a naked co-owner during this period, or by such operation of the business with his knowledge and acquiescence, as is shown by the record, did the relationship of the parties undergo such change and assume such a nature as to create a partnership in law? There is nothing in the record to indicate that the continuance of the business in this manner was merely for the benefit of Yost and Sewell, or that its operation was other than for the equal benefit of the three owners and their common profit. Freeman, as has been stated, knew that it was being actively conducted, and permitted it, if not with approval, certainly without interference. He intrusted the management of his interest to Yost, and must have known that it was being devoted to the common object of the business. As completely as did either Yost or Sewell in respect to their interest, he dedicated his interest to its purposes and aims, not by express direction, it is true, but by tacit agreement having all the force of positive authorization. No other inference can be indulged than that his intention was that it should share the general fate of the business during this entire period. It amounted to a contribution to the capital, and it will not be supposed that he thus committed its use without the expectation of sharing in whatever profits it might help to produce, in which his right to participate must, at all events, be conceded. Manson v. Williams, 213 U. S. 453, 29 S. Ct. 519, 53 L. Ed. 869. The result necessarily was the creation of a relation between Yost, Sewell, and himself, as principals, that amounted to an agreed joinder of their interest in a common enterprise, its prosecution for their joint account, and an ensuing right in each of them to share in its net returns as such. He ceased to be a naked co-owner when by clearly implied agreement he permitted his interest to be put to work as capital in the business. He thereby became a partner under elementary principles of the law upon the subject. It is immaterial that the business yielded no profits, and that in consequence Freeman shared in none. There existed by his tacit agreement a community of interest, the common enterprise, its operation for the joint account, and a right in the owner of each interest to share as a principal in its profits as such, which under the established rule in this state is a recognized test of the relation. Miller v. Marx, 65 Tex. 131; Stevens & Andrews v. Bank, 62 Tex. 499; Kelley & Co. v. Masterson, 100 Tex. 38, 93 S. W. 427; Dilley v. Abright, 19 Tex. Civ. App. 487, 48 S. W. 548. The law recognizes that partnership is the creature of contract, but it is not essential that parties agree to become partners by name, or that their agreement be an express one. If by implied agreement they assume a relation that the law constitutes a partnership, they become partners in fact.

"It is unnecessary to review the authorities, which are numerous, covering many different aspects of the relationship, and have been diligently presented in the able briefs of counsel for both the plaintiff and defendants in error. The question is resolved at last by

general principle, which furnishes an accurate and conclusive test and is as safe and authoritative a guide as an imposing number of adjudicated cases."

For further definitions and illustrations in aid of our conclusion, too numerous to particularly notice in this already extended opinion, see definitions and cases cited in Words and Phrases, Second Series, vol. 3, under the title "Partnership," p. 881 et seq.; and Bell v. Bell (Tex. Civ. App.) 259 S. W. 1105; Buzard v. Bank of Greenville, 67 Tex. 83, 2 S. W. 54, 60 Am. Rep. 7; 35 C. J. 951; Cothran v. Marmaduke, 60 Tex. 370; 30 Cyc. 351; Fink v. Brown (Tex. Com. App.) 215 S. W. 846; Freeman v. Huttig Sash & Door Co., 105 Tex. 560, 153 S. W. 122, Ann. Cas. 1916E, 446; Kelley Island Line & Transport Co. v. Masterson, 100 Tex. 38, 93 S. W. 428; Ogus, Rabinovich & Ogus Co. v. Foley Bros. Dry Goods Co. (Tex. Com. App.) 252 S. W. 1051; R. H. White Co. v. Jerome H. Remick & Co., 198 Mass. 41, 84 N. E. 115; Seale v. Garvey (Tex. Civ. App.) 247 S. W. 672.

The further assignments of error presented by appellant, to wit, that the court erred in refusing to give a charge on circumstantial evidence, and that the jury was guilty of such misconduct as to require a reversal of the judgment, are untenable. We think a reference to the evidence already given sufficiently shows that the case is not one of circumstantial evidence, even if it would otherwise be proper. Moreover, the special charge requested on this subject imposes a greater burden of proof upon appellee than authorized by law. In terms, it required a finding, not only that the conclusion sought to be established must be proved by a preponderance of competent evidence, but that "the circumstances, taken together, must be of a conclusive nature, leading, on the whole, to a satisfactory conclusion, and producing in effect a reasonable certainty in your mind that the issues in question should be answered 'Yes,' and unless you do so find and believe from the evidence under the instructions herein given you, you will answer 'No' to each of said respective issues."

The alleged misconduct of the jury as presented arose substantially as follows: There was no contest as to the market value of the several items of feed that went to make up appellee's account, which aggregated $1,559.10, and, while the jury were deliberating; they returned in open court and submitted the following question: "If we find that the defendant is liable to plaintiff, are we at liberty to set an amount less than the market price charged, of $1,559.10?"

In reply to this interrogatory, the court instructed the jury that they should be guided in making their answers by the testimony introduced on the trial under the ruling of the case, informing them also that the legal effect of their answers were for the court alone. The evidence shows that, when the value of the feed furnished by appellee aggregated $1,067, a representative of appellee approached Moore for payment, at which time Moore in emphatic terms denied liability and instructed the representative to sell no more feed and charge it to him. Upon hearing, the evidence of two of the jurors was taken. The substance of their testimony is that they decided that both parties plaintiff and defendant were at fault, and that Moore should not wholly be penalized, that they had both used slack business methods, and that the loss should fall on both of them. This attitude persisted even after the jury had presented the question aforesaid to the court and received the court's instruction, with the result that the verdict in appellee's favor in the findings was for the said sum of $1,067.

We fail to see how this conduct on the part of the jury was prejudicial to appellant, and if for no other reason we conclude that the assignments last mentioned, as well as all other assignments and propositions, must be overruled, and the judgment affirmed.